Yvonne RODRIGUEZ, Plaintiff,

v.

The McGRAW–HILL COMPANIES, INC. Long Term Disability Plan, Robert Marchetti, as Administrator of The McGraw–Hill Companies, Inc. Long Term Disability Plan, The McGraw–Hill Companies, Inc., and The Prudential Insurance Company of America, Defendants.

No. 02 Civ. 0045(JSR).

United States District Court, S.D. New York.

Jan. 6, 2004.

Daniel G. Heyman, Scarsdale, NY, for Plaintiff.

Gregory I. Rasin, Jackson Lewis, LLP, Cuyler Burk, Julie M. Vales, Cuyler, Burk, L.L.P., New York City, for Defendants.

## OPINION AND ORDER

RAKOFF, District Judge.

With the gruesome example of AIDS so salient in our collective consciousness, it should come as no surprise that "new" diseases are first recognized by their symptoms and only much later by their etiology. At what point, therefore, an ailment becomes "medically determinable" is a complex question, not easily reducible to a single test or formula. The issue here presented is whether the malady known as "fibromyalgia" is medically determinable, notwithstanding the absence of a definitive objective test for its diagnosis. The issue arises in the context of the parties' renewed cross-motions for summary judgment.[1]

The facts pertinent to the instant motions are as follows. Plaintiff Yvonne Rodriguez began working for defendant McGraw–Hill Companies ("McGraw–Hill") as a secretary in July 1979 and, over the course of the next twenty years, rose to become Director of Editorial Operations for Business Week Magazine, in which capacity she was responsible for, *inter alia,* the production, printing, and timely closing of each edition of the magazine. *See* Affidavit of Daniel G. Heyman, sworn to July 26, 2002 ("Heyman Affidavit"), Ex. U (Deposition of Yvonne Rodriguez, June 6, 2002, hereinafter "Rodriguez Deposition") at 10–11, 38–39. Between December 1998 and February 1999, however, plaintiff was diagnosed as suffering from costochondritis, fibromyalgia, and chronic fatigue syndrome—ailments that, she alleges, caused her severe pain, headaches, and fatigue. Rodriguez Deposition at 43, 66, 68.

According to Rodriguez, by June 1999 her symptoms had become so severe that she was unable to perform her normal duties. *See* Rodriguez Employment File D00725–726. Beginning June 28, 1999, she went on leave and, under the terms of McGraw–Hill's Short Term Disability Plan, received 100% weekly compensation for a period of 26 weeks. When this was exhausted, she applied for the first tranche of the longer-term disability benefits available under McGraw–Hill's Long Term Disability Plan, which, if granted, would have provided her with certain benefits for an additional 24–month period commencing December 28, 1999. However, the Plan Administrator, co-defendant Prudential Insurance Company of America, denied the request. After exhausting her administrative appeals, Rodriguez commenced the instant lawsuit, seeking the 24–month additional benefits and other relief.[2]

The operative provision of the Long Term Disability Plan, Section VI, states in subsection (1) that:

> A Participant shall be entitled to benefits under the Plan, beginning … the first day following the Qualifying Disability Period [i.e., the 26 week period provided for under the Short Term Dis-

1. Previously, by Order dated October 18, 2002, the Court granted defendants' motion for summary judgment on the sixth of plaintiff's six claims for relief (relating to whether the defendant violated plaintiff's ERISA rights under 29 U.S.C. § 1140), and granting plaintiff's motion for summary judgment in so far as it sought a *de novo* standard of review and the opening of the administrative record to include the testimony of Mark Morrison, Managing Editor of Business Week Magazine. The parties' original cross-motions for summary judgment were denied in all other respects.

2. Although plaintiff seeks long-term disability benefits going beyond the 24–month extension, these claims are not properly before the Court since they involve a somewhat different test than that applicable to the 24–month extension, *see infra,* and the Plan Administrator has never ruled on them. *See Peterson v. Continental Casualty Co.,* 282 F.3d 112 (2d Cir.2002).

ability Plan], upon presentation of proof that he/she incurred Total Disability due to accidental bodily injury or disease. Heyman Affidavit, Ex. F (McGraw–Hill Long Term Disability Plan) at 8.

Subsection (2) of Section VI, in turn, defines "Total Disability" to mean:

(a) with respect to the Qualifying Disability Period and the first 24 months thereafter, a state of incapacity resulting from a medically determinable physical or mental impairment which prevents the Participant from performing his/her normal duties for the Employer, and

(b) after the period described in (a) above, a state of complete incapacity resulting from a medically determinable physical or mental impairment which prevents the Participant from performing any occupation or employment for which he/she is reasonably qualified by education, training or experience.

*Id.*

Thus, to qualify for the 24–month extension she here seeks (and that the Plan Administrator denied), plaintiff must show, based on the administrative record,[3] that at all relevant times she was sufficiently incapacitated by medically determinable impairments to be unable to perform her normal duties.

■ With respect to at least one of the ailments here in issue, fibromyalgia, defendants argue that no such showing is possible because its diagnosis, they allege, is so subjective as not to be "medically determinable." In light of this argument, the Court, with the parties' consent, sought assistance from the Program on Court Appointed Scientific Experts of the American Association for the Advancement of Science, which in turn recommended three potential candidates to serve as the Court's technical advisor on this issue. After consultation with the parties and review of the candidates' qualifications, the Court selected Lawrence Kagen, M.D., Professor of Medicine at the Weill Medical College of Cornell University and a highly regarded rheumatologist, to serve as the Court's advisor.[4]

After a thorough review of the relevant materials, Dr. Kagen submitted a succinct but most helpful report. *See* Kagen, *Fibromyalgia Report for the Court* (the "Kagen Report"). The report notes that, even though "the causation and pathogenesis of this illness remain unknown," *Kagen Report* at 4, fibromyalgia has nonetheless achieved the status of a "diagnostic entity recognized by the American College of Rheumatology," *id.* at 3. This is because, even though no "objective, specific diagnostic test" for fibromyalgia has yet been developed, *id.* at 5, the widely-reported subjective symptoms—such as "the presence of widespread chronic pain present for at least three months in all four quadrants of the body" and "tender points . . . present in at least eleven of eighteen predetermined body parts," *id.* at 4—provide sufficient criteria for diagnosing the condition and distinguishing it from other ailments. *Id.* at 3–4. The bottom line is that "experienced physicians do recognize fibromyalgia as a real entity." *Id.* at 4.[5]

3. As previously noted, the administrative record has now been enlarged to include the previously-excluded testimony of Mark Morrison, and will be reviewed by the Court *de novo*.

4. The Court takes this occasion to express its great thanks to Dr. Kagan and to Deborah Runkle, Project Manager with the Program

on Court Appointed Scientific Experts, for their assistance in this matter.

5. According to the most recent issue of the Harvard Women's Health Watch published by the Harvard Medical School, "Two to four percent of Americans have fibromyalgia, and . . . [it is] second only to osteoarthritis as the

It follows that, for the purposes here relevant, fibromyalgia is medically determinable. While the absence of a dispositive objective test may make the diagnosis more difficult, medical determinability has never been wedded to such a requirement—as shown, for example, by the numerous recognized mental disorders for which there is no objective test whatsoever. The Court therefore rejects defendants' argument that fibromyalgia does not qualify as a medically determinable impairment under McGraw–Hill's Long Term Disability Plan.

The Kagen Report goes on to conclude that fibromyalgia can lead to substantial physical and cognitive disabilities, *id.* at 5, and that, despite the reliance on subjectively elicited information, "it should be possible in many cases for an examiner to determine a level of function indicative of the presence of work disability," *id.* at 6. The Court agrees. Indeed, that fibromyalgia can in certain cases result in severe disability is no longer an open question in the Second Circuit, for the Court of Appeals has recently held that "fibromyalgia is a disabling impairment" that can qualify an individual for disability payments even though "there are no objective tests which can conclusively confirm the disease." *Green–Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir.2003). *See also Lisa v. Secretary of Dep't of Health and Human Services,* 940 F.2d 40, 43 (2d Cir.1991).

■ This still leaves open, however, the question of whether, based on the administrative record, plaintiff has proved both that she suffered (at the times here relevant) from fibromyalgia and/or the other ailments of which she complains and that, as a result, she was in the requisite "state of incapacity" during the 24–month period

for which she now seeks damages. Dr. Kagen notes that these are in effect the conclusions reached by the physicians who actually examined Ms. Rodriguez, and that "[t]he experts who have suggested otherwise have examined the records, not the patient." *Id.* at 6. Before undertaking its own *de novo* review of the administrative record, however, the Court would like to develop a firmer basis for clarifying the ambiguities in some of the testimony given below, as well as for assessing the credibility of the competing experts. Accordingly, while the Court's ultimate determination will be based on the evidence in the administrative record, the Court hereby exercises its authority to convene a brief hearing for the aforementioned purposes. *See generally Connors v. Connecticut General Life Insurance Co.,* 272 F.3d 127, 134–35 (2d Cir.2001); *DeFelice v. American International Life Assurance Co. of New York,* 112 F.3d 61, 66 (2d Cir.1997).

Specifically, the Court will set aside six hours for this hearing. In the first four hours, plaintiff will present herself and at least one of the doctors on whose testimony she relies, for a combined total of three hours cross-examination by defendants' counsel on the testimony given below, followed by a combined total of one hour redirect testimony. In the remaining two hours, the defendants will present one or more of those doctors on whose testimony they rely, for a combined total of one and one-half hours cross-examination on the testimony given below, followed by one-half hour redirect testimony.

Except to the limited extent indicated above, the parties' renewed motions for summary judgment are hereby denied. Upon receipt of this Opinion and Order,

condition most frequently diagnosed by rheumatologists." Harvard Medical School, Har-

vard Women's Health Watch, Jan. 2004, at 4.

**680**

counsel for the respective parties should jointly call Chambers, by no later than January 16, 2004, to schedule the aforementioned hearing.

SO ORDERED.